Judge Joe Flatt is here today by audio hookup and will be listing the oral argument, asking any questions he's got, and participating in the conference. That said, we're going to start with the United States v. Iriele. Ms. Strickland, did I pronounce your client's name correctly? It's Iriele, Your Honor. Iriele. Okay. Sorry. Good morning, and may it please the Court. The jury instructions in this case were so fundamentally flawed that none of Mr. Iriele's convictions can stand. Now, there are errors in the jury instructions for every single count in the indictment, but I'm going to start with the drug counts, and that is in part because the money laundering counts rely on the drug counts to establish that there were illegal proceeds. What standard of review are we using on your challenges to the jury instructions? There are different standards of review that will apply to different instructions, Your Honor. As far as our main argument, that the jury was not charged that a pharmacist must fill the prescription knowing that the physician issued the prescription outside the usual course of medical practice or without a legitimate medical purpose, Your Honor, I believe that will be reviewed for plain error, which I think we can clearly establish. However, our contention that the Court erred by instructing the jury that good faith is, in fact, irrelevant to their inquiry on all of the drug counts is preserved. Counsel specifically objected to that instruction. And then as far as the money laundering counts, we believe that that is preserved because counsel did submit a request to charge on the money laundering counts that the Court then did not charge on at all. So we believe that... But he didn't renew that objection at the time of the charge, did he? He did not renew that objection, Your Honor, but he didn't state that he agreed with the Court's charge and really the only opportunity... He didn't invite to error. He just, if he was required to renew the objection, he just didn't preserve it. Right, he did not renew the objection, but I also believe the Court did not necessarily ask for any objections on that, only asked if he had read the charges correctly. And that is when counsel volunteered one amendment to the charges. But as far as the drug counts in this case, you know, this is a case where the government was alleging that Mr. Ariely and his pharmacist wife were dispensing drugs through their pharmacy pursuant to written orders from a doctor. So there's no dispute that the drugs were dispensed from a pharmacy pursuant to a written order from a doctor. And this Court, from the time that it was still a part of the Fifth Circuit, has been clear about what the government must prove to convict a pharmacist of an 841 offense, and that is that the pharmacist filled the prescription knowing that the drug was prescribed by the doctor who was acting outside the course of professional practice or without a legitimate medical purpose. But your client was no longer a pharmacist. That's correct, Your Honor. He was no longer a pharmacist. However, even if you're going under an aiding and abetting theory, then you have to show the intent of the pharmacist. These drugs were coming through a pharmacy. So even if he was aiding and abetting Ms. Afume, the pharmacist, then the jury has to be instructed somewhere that a pharmacist's intent must be to distribute those drugs knowing that the prescription was bad. But doesn't that standard only apply to licensed pharmacists under Joseph? Your Honor, the standard applies to licensed pharmacists, but here, again, the drugs are coming through a licensed pharmacist. This is not an allegation where someone is just distributing drugs on the street. They're coming through a pharmacy pursuant to written orders. And Mr. Iriele himself was not the one filling these prescriptions. He is an employee of the pharmacy that is owned by his wife. And so any allegation that the drugs are being dispensed illegally has to include the allegation that they were dispensed while the pharmacist knew that the prescription was bad. And here, there's just no way for the jury to know that the pharmacist had to know that the prescription was bad. But the Controlled Substances Act accepts only the lawful acts of those who are registered to dispense controlled substances. So if he is not registered to dispense controlled substances, and this is his criminal trial, isn't he kind of fortunate to have received the instruction he received? No, Your Honor. Again, this is, it's coming through a pharmacy at the end of the day. And the government treated Mr. Iriele as a pharmacist throughout the trial, in the indictment, and in their closing argument, they repeatedly said these two pharmacists knew what they were doing. They treated him as though he was a pharmacist. They even admitted the 404B evidence that is only relevant if you're considering him as a pharmacist. So the government has treated him that way throughout the course of these proceedings, and it's only when they've been called out on appeal and it's been pointed out that they did not give the correct standard to convict him that they have changed their positions and said, well, he's not a pharmacist. And again, even if he is not actually a pharmacist, they're coming through a pharmacy pursuant to a written order from a doctor, and so he could only aid and abet Ms. Ifume in the distribution of those drugs, and she is the pharmacist, and therefore the jury would have to be instructed on a pharmacist's intent even to find Mr. Iriele liable for aiding and abetting that. Yet in these instructions, they essentially create a strict liability offense for the pharmacist where if the prescription's bad, the pharmacist fills it, then they're guilty. And that is reinforced by the fact that the court instructed the jury specifically that the defendant's good faith is irrelevant here. So if you take it as a whole, then there's absolutely no way that the jury knew that you could only find these two defendants liable if the prescriptions were filled while someone knew that they were bad prescriptions, that they were not issued in the course of usual professional practice. And that has been clear from the time that this court decided Hayes is the Fifth Circuit. It was reinforced in Hammond in 1984 and again in Joseph in 2013. So I don't think there's any dispute that that is the standard to convict a pharmacist and that is the standard to convict a... If you did not object, which my inclination, or did not preserve it, which is my inclination subject to careful study later, but then you've got to show plain error. Yes, Your Honor. Third prong of plain error requires you to show reasonable probability of a different result. That's correct, Your Honor. How can you show that? I think the evidence, and specifically on this element, is very weak in this case. On the knowledge of... Well, it's either sufficient to support proof beyond a reasonable doubt or if it's not. And if it's sufficient to support proof beyond a reasonable doubt, then you can't show a reasonable probability of a different result, can you? Your Honor, I believe that those aren't necessarily the same standards, but I think we can meet those. If the government can show proof beyond a reasonable doubt, then the jury under the proper law and the evidence could have convicted him. And you can't show a reasonable probability that if they had been told, instructed correctly, they wouldn't have convicted him, can you? Your Honor, we can, and we've raised sufficiency in this case because we... No, no. I'm saying if the evidence is sufficient to prove beyond a reasonable doubt that he had the necessary intent, then you can't show a reasonable probability of a different result had the jury been instructed he had to have the necessary intent, can you? Your Honor, I believe we can because there are other places in his instructions where the jury was provided with instructions that could have led them to convict on other grounds. And specifically... Could have doesn't count, counsel. The burden's on you. The difference between a properly preserved objection and plain error review because there was no properly preserved objection is who has the burden, not could have convicted. If you preserve it, then the government has to show harmless error beyond a reasonable doubt on a constitutional error. But if you don't preserve it, you have to show a reasonable probability of a different result. And where there's some evidence both ways, then it depends on whether you preserved it or not because that's what assigns the burden. And what I'm suggesting to you is that your argument that there was plain error, third prong, reasonable probability of a different result, collapses into your argument that there was insufficient evidence to convict him even if he had been properly... If they had been properly instructed. And I'm just asking you about my analysis of that. What is wrong with the syllogisms I've just presented to you, which is you either have sufficient evidence to convict him beyond a reasonable doubt regardless of the instruction or you don't. And if you don't, you're entitled to relief anyway. If you do, then you can't show plain error because you can't show with sufficient evidence to prove beyond a reasonable doubt that there's a reasonable probability the jury would not have convicted him even though there was sufficient evidence. Yes, Your Honor. We believe that there was not sufficient evidence to establish that specifically Mr. Ariela knew that these prescriptions coming from the clinic were bad. And then we also believe that there are other grounds on which the jury could have convicted him given the evidence in this case and all the statements about red flags and the things that the government argued in their closing were illegal acts that were not the knowing of these prescriptions. The red flags also feed to some extent, to a large extent, into the circumstantial evidence that he knew. The more red flags there are, the more circumstantial evidence there is that he knew. I'd agree with that, Your Honor. And I see I'm out of time. Okay. We'll give you a full five minutes and now we'll hear from Ms. Boatwright. Thank you, Your Honor. Good morning. May it please the Court, I'm Laurel Boatwright on behalf of the United States in this case. Through more than two weeks of trial, 25 witnesses, and over 100 exhibits, the jury learned overwhelming facts through admissible evidence that this defendant and his wife intentionally were in a pharmacy that supplied more than a million highly addictive pain pills to a pain clinic across the street. I think it's significant to point out that even in the defendant's opening statement, he all but conceded that the clinic was illegitimate, said there was bad stuff going on over there and he wasn't at all surprised that the doctors and the clinic owners had pleaded guilty. That the only question for the jury in this case was whether this defendant, a former trained pharmacist, knew that the prescriptions emanating from that clinic for controlled substances were issued outside the usual course of professional practice and without a legitimate medical purpose. The jury heard from a clinic doctor herself who testified that the prescriptions she issued were illegitimate, heard from two experts, a medical expert and a pharmacy expert, to the same effect. The jury saw through photos and videos and heard from witnesses that defendant could see an enormous number of red flags just from the front door of the pharmacy, leaving aside what actually happened inside the pharmacy. Visible from Medicine Center Pharmacy were the hordes of humans lining up outside the clinic across the street first thing in the morning. The clinic itself was, of course, a rundown old house that didn't even advertise as a pain clinic. People rushed the door like a, quote, rat race. The moment the clinic opened, they'd wait all day and then the clinic would refer them across the street to the defendant's pharmacy to buy their pills. The jury could reasonably infer that the defendant observed all of this suspicious activity at some point during the four years of the charged conspiracy. The jury learned that either the defendant or his wife were at the pharmacy all day, every day. Customer and employee witnesses knew those two were in charge of the pharmacy. Witness after witness referred to Rosemary or Dawn, Rosemary and Dawn, Rosemary being the defendant's wife and Dawn being the defendant. Defendant personally acted, interacted with pharmacy customers. Indeed, he was, quote, often the only person in the pharmacy, according to one of the clinic doctors. The defendant knew pharmacy customers sometimes passed out, fell asleep, or just plain didn't look right. He knew that they were, they showed up in groups, having traveled long distances. They didn't look like they had any major illnesses that would require that many pills. They were shaggy, unkempt, they smelled. That's according to other pharmacists, unrelated to this case, who testified at trial, that that's how the clinic patients looked to them. One of those pharmacists, by the way, got around to reporting the clinic to law enforcement. There was no evidence the defendant or his wife ever did so. The jury actually saw videos of customers inside the defendant's pharmacy moments after they got their bag of pills, casually sell them to an undercover officer, openly, in plain view. The jury learned that the defendant supervised pharmacy employees, rang up customers, heard them complain about the pharmacy's exorbitantly high prices, told them that for oxys, oxycodone, one of the more desirable pills for resale on the street, for that they'd have to pay cash. The defendant and his wife were the only trained pharmacists with access to the pharmacy's computer and the dispensing records, which showed that the great bulk of all the pharmacy's prescriptions that were being issued from the clinic across the street. In fact, that clinic's prescriptions accounted for more than 90% of the pharmacy's gross sales. To meet the extraordinary demands posed by the clinic, the defendant and his wife were purchasing 10 to 15 times more oxycodone and controlled substances than any other pharmacy in that same general area, in that same zip code. They did so after counting up all the cash at the end of the day, only defendant or his wife did that, and periodically making bulk deposits of that cash in pharmacy business accounts to pay the drug distribution companies to get the pills to turn around and to dispense them to these customers. It's also worth pointing out that the majority of these drug distribution companies eventually stopped selling pills to defendant's pharmacy. And more particularly with respect to the conspiracy with the particular clinic owners across the way, the jury learned exactly how well defendant and his wife knew them. It was not arm's length. Their relationship was such that witness after witness testified mistakenly that they appeared to be related, or they were at least in business together, the clinic and the pharmacy. So well that early on, the clinic was actually ordering prescriptions with the pharmacy's address and the pharmacy's phone number pre-printed on the prescription at the bottom. There's also evidence that the jury heard the relationship between the clinic and pharmacy was such that clinic employees could come get discounts at the pharmacy, and pharmacy employees, including the defendant's own wife, could go across the street to the clinic at no charge, not have to wait in line, and get a prescription for controlled substances. Was there any evidence about whether anybody else outside the clinic in the pharmacy got the discounts at the other establishment? No, Your Honor. Not that I recollect. At trial and perhaps most significantly, two patients testified credibly that they remembered it was the defendant who personally filled their prescriptions, went back to the part of the pharmacy where the pills are, got them their pills, he dispensed them. And this was at a time when he, it is undisputed, he was not authorized to do so. His license had been revoked in 2007. He'd been criminally convicted in 2008. Two witnesses credibly testified that he did it personally. Now that is significant because the defense has made much of the fact that the government supposedly is only just now on appeal, resting on the defendant's criminal liability as no longer being a licensed practitioner. Contrary to that argument, the government did argue this fact to the jury. It was alleged, first of all, in the face of the indictment, Donatus Sirielli was a former pharmacist, twice in the opening. At Doc 752-161, the government argued the defendant, quote, wasn't even supposed to be filling prescriptions because his license had been revoked, quote, he shouldn't have been filling prescriptions at all during this time, 2009 through 2012. And then again in closing, the government argued only Medicine Center Pharmacy allowed a pharmacist who had his license revoked to fill controlled substances prescriptions. You heard from patients that it was the defendant who filled them, and that happened after he had his pharmacy license revoked. Now, with respect to the 841, the correct 841 legal standard for a pharmacist, defendant has conceded, they never raised this objection below. It's actually a series of objections that the licensed pharmacist has to know that a pharmacist is not a pharmacist, illegitimately. They're also arguing that the instruction incorrectly applied the standard of a physician to him, a pharmacist, implicitly that there's a different legal standard for physicians than pharmacists. And they more, this is the most significant part, they argue that the jury instructions contain nothing on mens rea, so that the jury could have convicted the defendant of a strict liability crime. None of that is true. There is no error on either of those grounds. The jury instructions, let's start with the last one first, the jury instructions are replete with references to knowledge and intent on behalf of the defendant, particularly for counts one through four. Those are all the drug counts. Count one charges the defendants knowingly and willfully conspired to distribute and dispense illegitimately. It's a separate federal crime for anyone to conspire to knowingly and intentionally distribute. That's page 16 of the jury instructions. Page 18, the defendant must have knew the unlawful purpose of the plan and willfully joined in it. Later on for counts two, three, and four, the district court charged the defendant must have knowingly and intentionally distributed illegitimately. Defendant can be found guilty only if the defendant intended to distribute and dispense these controlled substances outside the usual course or without a legitimate medical purpose. It goes on and on and on. 841A makes it a crime for anyone to knowingly or intentionally distribute or dispense a controlled substance except as authorized by federal law. That's at page 16. So it's simply not the case that we're at any risk that the jury found the defendant guilty just for having committed an action with no knowledge requirement and no mens rea at all. Now, it's also important to point out the defendant has misunderstood the requirements of the Controlled Substances Act and its implementing regulations. For the benefit of the court, in preparation for oral argument, I actually learned of a different case, United States v. Steele, 147F3-1316. It's an 11th Circuit case from 1998. I believe, Judge Carnes, you may have authored it. I found this case because I was looking for situations where a pharmacist was convicted of 841A, but for, for example, filling forged prescriptions. And in that case, it's an en banc opinion. This court decided there was actually no requirement that a pharmacist who's being charged only with 841A violations, not a conspiracy, there is no requirement that he be charged with dispensing outside the usual course of professional practice or without a legitimate medical purpose. It was sufficient that the indictment charged that he had knowingly and intentionally dispensed illegally. Now, the significance, the basis upon which the court issued that ruling was because of Section 885, which says the government is not required to negate an exception to a criminal law. And because the exception, 841A is the rule, and the exception is if you're a licensed practitioner, that's where the two prongs come in, this court has already said, for a pharmacist, that is not required. Now, let's also, this is significant, there's a reason for that, right? If it cannot be the case that a pharmacist is only violating 841A if there's a physician issuing the prescription and the pharmacist knows the physician issued the prescription illegally. Why is that the case? One can easily imagine a scenario in which the physician actually issues a prescription properly, does everything right. There's a legitimate pain, there's a legitimate basis, they don't see any red flags, they conduct all the necessary exams, compliance checks, et cetera, et cetera. But it's only when that customer walks to the pharmacist with the prescription that the pharmacist becomes aware of additional information that now makes dispensing pursuant to that prescription illegal. The pharmacist can see, for example, track marks, can see the circumstances under which the customer arrives in a group, can check a prescription drug monitoring program and see that he's been doctor shopping or has been going to pharmacies all over the place. Under those circumstances, the pharmacist would be guilty of violating 841A while the physician would not. Separately, we know from the Steele case that a pharmacist can be convicted of 841A when there's not even a physician involved. So it's simply not the case that the defendant's understanding of 841A is the law in all circumstances. Now, even if there were error, it's certainly not plain and not clear and not obvious as this court has acknowledged in the Tobin case. Sometimes the precedent has not always been clear with respect to specifying the standpoint from which a jury is to determine whether a prescription was issued for a legitimate medical purpose. And the government would respectfully submit that it's not always been clear about when a prescription is dispensed by a pharmacist either. Hayes and Joseph, as the panel has pointed out, are both distinguishable because they apply to a licensed practitioner who the defendant is not. The defendant is also incorrect when they allege that the only circumstances under which he is guilty of a crime under the indictment is for aiding and abetting dispensing. That's not true. In count one, he is charged with willfully and intentionally dispensing and distributing. The significance of that is the jury was instructed that anyone can be charged with unlawful distribution. At that point during this conspiracy, the defendant was just like everyone else without a pharmacy license. He did not. He was illegally distributing. So he aided and abetted the dispensing of licensed practitioners, the doctors, and the other pharmacists, including his wife. But he also intentionally conspired to illegally distribute, not to mention knowing that the controlled substances were being further distributed by the customers who he knew were likely selling them or trading them in the street. So as the court has pointed out, even if the court erred and it was plain, it certainly did not affect the defendant's substantial rights for all of the reasons and all of the evidence that the government recited at the beginning. I'd like to move on to the good faith is irrelevant objection. Defendant did not preserve this at trial if for no other reason than the arguments that he now makes on appeal are completely different than what he made below. So the district court never had a chance to pay attention to the idea that perhaps he should be instructed on a different, on an objective standpoint or state of mind versus the subjective state of mind for the different prongs. Now the government has asserted that if the court reads carefully, the exchange over the good faith is relevant. The defendant actually invited error. But for purposes of this, let's assume it's just plain error. We've already discussed why the law isn't that a pharmacist must specifically know a physician issued an illegitimate prescription. The bigger problem is that since Tobin, it's been black letter law that good faith is irrelevant to 841A. The Tobin court actually states because the mens rea of 841A consists of knowledge rather than willfulness, any evidence that they acted with a sincere belief would be quote irrelevant. And even if it's error, it's certainly not plain. Defendant's brief concedes as much. For all of these reasons, Your Honor, the government alleges that the evidence was overwhelming and sufficient to support the convictions in this case and they should be affirmed. Thank you. Thank you. Ms. Strickland. It might be helpful if you addressed her good faith is irrelevant Tobin argument to start with. Yes, Your Honor. As far as Tobin, I believe that if you read that opinion, it makes clear that when they are talking, they're talking first about what is required for a conviction, the mens rea required under 841A. And then they turn to the specific mens rea required in the exception in CFR 1306.04. And at that point, when they are talking about the objective subjective standard, they are talking about the standard to convict a doctor. They are talking about whether it was issued outside the usual course of medical practice and whether it was issued for a legitimate medical purpose, which is the standard that you look at for a doctor prescribing. And it is not the standard that you apply to a pharmacist, as was made clear again in Joseph, which was after Tobin, where they're specifically looking at the pharmacist. And there they make clear that the pharmacist must know that the doctor dispensed without those requirements. And again, the government started their argument with the fact that the only question here was knowledge. And they say that, you know, there was mens rea in the instructions because they were instructed on knowledge, but they were never specifically instructed on the knowledge that a pharmacist must have. They were instructed that you must knowingly possess drugs and intentionally distribute them. They were never instructed that the pharmacist must know that the prescription is bad. And the Supreme Court just recently in Rehaef has emphasized how important this mens rea requirement is. It applies specifically to the knowing filling of the prescriptions and not just to the possession of the drugs. And that is what the instructions said. And just to the extent that the government is arguing that Steele said something different, Steele is a case about the sufficiency of the indictment. It is not a case about what the government must prove to convict a pharmacist. It is simply about what must be alleged in the indictment. Yes, but if the argument in Steele, and it's been a number of years, but if the argument in Steele was the fact that it wasn't contained in the indictment requires reversal because it's an element and the elements have to be set out in the indictment, if that was the issue, then it's the same thing as the instruction issue. Your Honor, Steele was about whether the exception had to be laid out in the indictment. And so the government does have to prove in this case that the exception did not apply. They still have to prove that. And Steele said you don't have to allege that the doctor was issued. And you almost said Steele said you don't have to prove the exception. That was not at all what I meant, Your Honor. Steele just says you don't have to allege it because it is an exception. But you do have to prove it if you're going to convict a doctor, if you're going to convict a pharmacist. And I just want to turn briefly to the government's recitation of the facts in this case because I think the government is again doing what it has done throughout the case and throughout its brief. And we pointed out a lot of it is one, the government is alleging facts that were not actually proven. If you look to the government's citations, they do not stand for the proposition that the government is citing it for. And secondly, the government is taking one example and acting as though that is the rule. As to the prescription pad that they want to argue over, there was one single prescription pad in one patient file of the many, many patient files that were admitted into evidence. There's one prescription pad from 2002, not even within the conspiracy here, for it's not even a controlled substance. So there's a single instance and they want to take that to say every prescription that the clinic issued had MCP's information on it. That's simply not true. They also want to say that you can see the front door of the clinic from the front door of the pharmacy. And if you look in their brief where they say that, they cite to exhibit 77. Exhibit 77 is a picture of the front door of the pharmacy. What they do not cite to is exhibit 76 that shows that the pharmacy is over here. The clinic is down the street with trees and buildings obstructing the view between the two. So the government has been misleading in its recitation of the facts before the court. And to the extent that the government wants to say that there was some kind of line from the clinic to the pharmacy or a rat race to get over there, it's own agents testified that they conducted surveillance. They stood there for days at a time and saw 10 to 15 people per day. Agent Crutchfield, who went into that office, said he saw one person one time, eight people the other time. How does that reconcile with the crowds at the pharmacy? There's evidence in the record that there were crowds at the pharmacy waiting to fill prescriptions. Your Honor, I'm not sure that there's evidence of exactly how many people were at the pharmacy at any given time. They didn't give a headcount. I didn't see anything anywhere about that, but I thought it was pretty strong evidence that there were crowds at the pharmacy and that they came in together in groups and they waited sometimes for long periods of time. And after they got their prescription, it was celebration time in the lobby and so forth. Your Honor, I believe a lot of that evidence is actually referring to the clinic, which is one of the problems in this case is that they're basically not distinguishing between what's happening at the clinic and what's happening at the pharmacy. And I know my time is up, but I do want to note that much of what the government is relying on is hearsay that came from that video that we have raised as another issue in this case that is essentially providing them with the link between this clinic and this pharmacy. I understand, but you can't raise an issue that she didn't have an opportunity to respond to because you didn't raise it in your opening argument. Sure, Your Honor. I didn't get to that. You preserved it in your brief. That's no problem. But I'm talking about the rules of opening and response and reply in oral arguments. Right, Your Honor. I merely wanted to point out that much of what she was arguing to you now does come from that video. Okay. Thank you, Your Honor. Thank you. We'll take that case under submission. The next one is Sowers v. R.J. Reynolds. Thank you, Your Honor.